IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  06-cv-00636-WYD-MJW

STEVE ABRAHAMSON and
APRIL ABRAHAMSON,

      Plaintiffs,

v.

SANDOZ, INC.,

      Defendant.

---

## ORDER

---

THIS MATTER is before the Court on Plaintiff Steve Abrahamson's Motion for Partial Summary Judgment on His FLSA Claim, filed May 30, 2007 (docket #80) and Defendant's Motion for Summary Judgment, filed July 12, 2007 (docket #87).

The Complaint alleges the following: wrongful discharge in violation of public policy, violation and retaliation under the Family Medical Leave Act ("FMLA"), intentional infliction of emotional distress, Fair Labor Standards Act ("FLSA") and Colorado Wage Claim Act violations, unpaid short term disability payments, and loss of consortium by Plaintiff April Abrahamson.

Cross motions were filed as to the FLSA claim.  Specifically, Plaintiff Steve Abrahamson's filed a Motion for Partial Summary Judgment on his FLSA Claim on May 30, 2007 and Defendant filed a Motion for Summary Judgment on July 12, 2007.  On August 30, 2007, the Plaintiff filed an Unopposed Motion to Dismiss Plaintiff's Claim for

Short Term Disability Benefits.  On September 4, 2007, an Order granting the aforementioned motion was entered.  For the reasons stated below, Plaintiff's Motion for Partial Summary Judgement as to his FLSA claim is denied.  Defendant's Motion for Summary Judgement is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

This action arises out of Plaintiff Steve Abrahamson's employment with Sandoz, one of the largest manufactures of generic pharmaceutical products in the United States.  Plaintiff was employed for eleven years in the quality-control department as a microbiologist at a facility in Colorado.  Plaintiff's microbiology unit was responsible for: (1) environmental monitoring of the facility and the utilities; (2) testing of some of the raw materials that came into the facility; and (3) product bioburden (testing products for microbial content).  Plaintiff's direct supervisor from August 2003 until his resignation in January 2006 was Shannon Tutt.

Plaintiff asserts that his primary job duties included "testing environmental conditions, testing raw materials, testing components that were used to test conditions and materials, identifying organisms and ordering supplies.  Defendant contends that Plaintiff's job duties included testing environmental conditions, raw materials and other samples, interpreting test results, identifying microorganisms, ordering or conducting additional testing if needed, initiating protocols, developing and revising standard operating procedures ("SOP's"), developing and validating methods, and training others.

From 2003 onward, the microbiology unit employed a handful of microbiologists

whose job duties were generally the same; their work was checked by one another and approved by a superior. Within the unit, smaller groups were formed to work on certain tasks, on a preassigned rotational basis.

In his deposition, Mr. Tutt, Mr. Abrahamson's former supervisor, testified that someone could not do Mr. Abrahamson's job without a college degree, that the minimum job requirements for performing the job at Sandoz required a college degree in the sciences, and that without a science degree a person would be unable to perform the job function of identifying microorganisms and raw material testing. See Res. To Sum J. Ex. D Tutt Dep. 261-263. Mr. Tutt also testified that although someone with a liberal arts education could function as a microbiologist, a typical English literature major, math major, someone with a law degree, someone with a finance degree, or someone with a political science degree would not excel in the identification of microorganisms and writing investigations. See Response to Summ. J. Ex. D. Tutt Dep. 263-264. Mr. Tutt also testified that with training, most high school seniors could do 90 percent of the job of microbiologist at Sandoz. Id. at 315:14-17.

As a pharmaceutical company doing business in the United States, Sandoz and its employees are regulated by both state and federal agencies, including the Food and Drug Administration ("FDA"). A GMP is a good manufacturing practice that is established by the Code of Federal Regulations. An SOP is a standard operating procedure established by the company to assure that the GMPs are followed. Plaintiff, along with other employees, must sign an agreement acknowledging their responsibility to follow GMPs and SOPs. SOPs tell microbiologists what needs to be done in their

testing. Plaintiff asserts that the SOPs specifically spell out what the microbiologists are to do and how they are to collect and record information. In contrast, Defendant asserts that the SOPs are often unclear and ambiguous and that they do not always provide all the information or instruction needed to perform the task. If there is a question as to whether an SOP has been violated an investigation might ensue. Plaintiff has never been assigned to lead an investigation, nor would he interpret the data gathered. Defendant asserts that Plaintiff participated in the investigation by retesting samples and offering his opinion on the interpretation of such testing. Even if Plaintiff disagreed with the conclusion reached in an investigation the only effect of this disagreement would be its notation in the investigator's record. Plaintiff did not have any authority to postpone a final determination.

As part of a company-wide process, in December 2003, Sandoz reclassified Abrahamson and several other microbiologists from nonexempt to exempt under the FLSA. Plaintiff's position was converted from Microbiologist III to PRO II. This change went into effect around April 2004. Plaintiff did not receive any additional pay and there were no modifications to his job duties following the reclassification.

Plaintiff was able to complete many of his job duties–including the testing and evaluation of samples and the drafting and revising of standard operating procedures–independently, without supervision and using his own experience and judgment. Microbiologists have the authority to order that the plant or part of the plant be shut down if, in their discretion and judgment, they believe product safety is being compromised. The microbiology laboratory utilizes a monthly rotational schedule for

environmental duties, with all exempt microbiologists being preassigned to perform the full range of those duties.

Associate microbiologists, or samplers, perform limited functions in the rotation. According to Plaintiff, there is an estimated 20-25 percent overlap in the job duties of an associate microbiologist and a Microbiologist I.

In February or March of 2004, while Plaintiff was working on the environmental monitoring rotation, he noted that Tutt had made modifications to the environmental monitoring form or template. Tutt was attempting to condense a multi-page document into one easy-to-read page. Plaintiff believed that the modified template failed to capture certain needed data, including data Plaintiff believed was required by both company SOPs and FDA regulations. The parties dispute whether there was a SOP governing the environmental monitoring form. Plaintiff communicated to Tutt his opinion that the form needed to have space for the missing data. Tutt looked into the matter and made the changes to the form recommended by Plaintiff. Plaintiff asserts that Tutt did not change the form until he was reprimanded by his supervisor.

In March 2004, Plaintiff observed that environmental monitoring data was being entered into an electronic database that was not validated. Tutt instructed Plaintiff to continue using the invalidated database because it was solely used for trending purposes which did not require validation. Plaintiff asserts that despite Tutt's direction to omit the data, Plaintiff continued to handwrite the missing data in the margins. Plaintiff also asserts that he would have reported Tutt's change, had he not feared retaliation by Tutt. Although Plaintiff believed that Tutt's practice violated a SOP or a

GMP, he could not identify such SOP or GMP.

In February 2004, the Microbiology Lab was testing a new medium (R2A) to replace the existing medium (Standards Methods Agar) used to cultivate bacterial colonies. The sterility verification test revealed one colony-forming unit out of five negative control plates; plates from each of the R2A sleeves were tested for sterility and Tutt examined the results and found them to be acceptable and found that they did not warrant discarding the R2A media.

In March 2004, Rob Wood, another microbiologist at Sandoz, discovered that certain individuals were not performing a check buffer to verify the accuracy of the pH meter at each use. Plaintiff and another microbiologist, Cassie Shiller, alerted Tutt to the pH check buffer issues. Tutt agreed with Plaintiff and Shiller, that it was a good practice to check the buffer each time the pH meter was used. Plaintiff acknowledged that at the time there was a "certain amount of ambiguity" in the SOP governing the calibration of the pH meter.

In late March or early April 2004, Plaintiff and Schiller brought their compliance concerns to former Quality Assurance Officer Pam Applehans. Applehans suggested that they discuss the matter with Saundra Granade, then Acting Director of Quality Control at Sandoz. Both Plaintiff and Schiller discussed their concern with Granade. Even though Plaintiff and Schiller jointly brought the compliance concerns to management, Schiller never experienced any retaliation or adverse treatment from Tutt. After Plaintiff raised the pH check buffer issue, Tutt directed the new microbiologist to perform a check buffer test each time they used the pH meter. The SOP was revised to

require the "first user of the day" to check the calibration of the pH meter.

Granade told Tutt that it was Plaintiff who had reported him. In September 2005, Quality Control Manager Melissa Figgins told Tutt that it was Plaintiff who reported him. Both Granade and Figgins testified that complaints like Abrahamson's are supposed to be kept confidential so that an "open-door policy" would be maintained because "a lot of times, when companies don't have an open-door policy, there's a fear of retaliation." Pl. Resp. S.J. Ex. 5 108:22-110:7.

In July 2004, Plaintiff received his mid-year review from Tutt. Plaintiff was "in general agreement with what was written about [him]" in that review. Def. Motion S.J. Ex. A. Pl. Depo. 232:15-18. Tutt gave Plaintiff a "fully met expectations" rating and Plaintiff was satisfied with that rating. On his 2004 end-of-the-year review, which Plaintiff received in March 2005, Tutt gave Plaintiff a "2" ("fully met expectations") rating on his Objectives. After reviewing input from his own supervisor, Figgins, Tutt changed his initial "2" rating to a "1" ("partially met expectations") on Plaintiff's "Shared Values and Behaviors" in his 2004-year-end-review. Plaintiff believed that he should have received a "2" rating under "Shared Values and Behaviors."

In May 2005, Plaintiff was involved in a disagreement with Tutt concerning the implementation of a new identification form. Plaintiff disagreed with Tutt on certain contents of the new form. When Tutt declined to implement Plaintiff's proposed changes, Plaintiff said, "We're paid by the company to do things the way you want to a certain extent." *Id.* at 187:18-20. Tutt responded purportedly with his voice raised," I hate [it] when you act like that." Id. at 187:23.

Plaintiff asserts that Tutt refused to assist him on a project involving a machine called Vitek. Plaintiff needed certain SOPs approved before he could begin the project, but Tutt did not help him complete the required paperwork. This paperwork delay postponed the project from getting off the ground.

Sandoz's reviews are based on two primary areas: (1) meeting objectives; and (2) meeting its parent company's "shared values and behaviors." Review scores are given in the format of a first number (ranging from 1 to 3 for objectives), followed by a second number (ranging from 1 to 3 for meeting the company's shared values and behaviors). The various delays in the Vitek project were noted in Abrahamson's 2004 mid-year review. Figgins testified that Abrahamson's 2004 year-end review was not consistent with the reviews he had received over the past ten years. Pl. Resp. To S.J. Ex. 7 Figgins Dep., 104:10-14. According to his 2004 objectives, Abrahamson was to complete the Vitek project by April of the same year. Abrahamson did not complete the Vitek project in 2004. Abrahamson received an many "2" ratings, indicating that Abrahamson fully met expectations, as "1" ratings, indicating that he only partially met expectations on his 2004 year-end review.

In August 2005, Plaintiff took a two-week FMLA leave for hemorrhoidal surgery. Upon returning from leave, Plaintiff was required to carry out a systems suitability or "instrument standardization" assignment. Plaintiff had been preassigned the system suitability rotation, which had to be performed at the end of the month. Plaintiff was under no medical restriction when he returned to work on August 30, 2005. Plaintiff had previously taken FMLA leave in March 2003. On September 26, 2005, Tutt

instructed Plaintiff to cancel a change control document he was working on so that Tutt could make modifications to the document. Plaintiff purportedly feared that halting the revision process he had initiated would cause delay and confusion. Plaintiff and Tutt became agitated. Plaintiff stated, "Okay, whatever, I'm done." Pl Depo at 193:20. Plaintiff asserts that Tutt also told him that "You are done" and "I'm calling HR, and I'm calling security." Id. at 193:11-25, 198:12-14. The parties dispute the date that the warning was issued, however they agree that Plaintiff received a "verbal" warning on his "lack of professionalism" and absenteeism. The warning dated, September 29, 2005, states, in part,

> On September 26, 2005, there was a disagreement between you and your supervisor. This disagreement resulted in you raising your voice and becoming extremely agitated within the Microbiology Lab. This outburst is similar to a May 5, 2005, event in which you shouted your disagreement at your supervisor and stormed out of a team meeting... In addition, a review of your attendance records shows an excessive amount of sick days taken during the calender year 2005... The Sandoz Work-Life Balance program states, 'Each absence due to the illness of an employee, whether one day or several consecutive days, is considered an 'occurrence.' ... More than two occurrences during a three month period may impact an employee's ability to perform their job and may result in an informal discussion between an employee and his or her manager."....

Def. Mot for S.J. Ex. DD.

Plaintiff disputes that Figgins issued Plaintiff an Off-cycle Performance Feedback on September 29, 2005, which is the date listed on the document and states that he received it on October 4, 2005. In the document, Figgins discussed Plaintiff's work deficiencies, offered suggestions for improvement, and formulated a plan to "assess [his] progress and provide feed back." Id. Ex. EE. One of the issues with Plaintiff's work and performance discussed was his failure to work his required hours

each day.

Plaintiff applied, and was approved, for FMLA leave from November 2, 2005 through December 5, 2005. Plaintiff took that leave of absence a day or two before his scheduled meeting with Figgins to discuss his performance. When Plaintiff left on his leave of absence on November 2, 2005, he had not yet decided that he was not returning to Sandoz; he was still entertaining the possibility of returning to work. Plaintiff subsequently extended his leave through January 4, 2006. When Plaintiff extended his leave, he had still not decided to resign from Sandoz. Plaintiff decided to resign from Sandoz at the end of December 2005, almost two months after he had commenced his leave of absence.

## II.    Standard of Review

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Equal Employment Opportunity Comm. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). "When applying this standard, [the court must] 'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment.'" *Id.* (quotation omitted).

"When the parties file cross motions for summary judgment, 'we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). Cross motions for summary judgment must be treated separately – the denial of one does not require the grant of another. *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (cited with approval in *Atlantic Richfield*).

## III. ANALYSIS

### A. Public Policy Wrongful Discharge Claim

The public policy wrongful discharge doctrine is an exception to the general rule that employment contracts are at-will and can be terminated at any time. *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999). To establish a claim for wrongful discharge under the public policy exception, Plaintiff must prove the following: 1) the employer directed the employee to perform an illegal act as part of the employee's work related duties; 2) the action directed by the employer would violate a statute or clearly expressed public policy; 3) the employee was terminated as a result of refusing to perform the illegal act; and 4) the employer was aware or should have been aware that the employee's refusal was based upon the employee's reasonable belief that the act was illegal. *Id.* at 667.

"The public-policy exception is grounded in the notion that an employer should be prohibited from discharging an employee with impunity for reasons that contravene

widely accepted and substantial public policies. *Crawford Rehabilitation Svcs., Inc. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997). "Although public-policy wrongful discharge is not subject to precise definition, it has been variously described as an action that involves a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer. . . leads to an outrageous result clearly inconsistent with a stated public policy, . . . or 'strike[s] at the heart of a citizen's social rights, duties, and responsibilities'. . . ." *Id.* (internal citations and quotation omitted). "Statutes by their nature are the most reasonable and common sources for defining public policy." *Rocky Mtn. Hosp. & Med. Serv.*, 916 P.2d 519, 525 (Colo. 1996).

However, in limited circumstances there may be other sources of public policy such as administrative regulations and professional ethical codes. *Id.* (holding that "professional ethical codes may be in certain circumstances a source of public policy." "However, we emphasize that any public policy must serve the public interest and be sufficiently concrete to notify employers and employees of the behavior it requires"). "The determination of whether the public policy asserted is a well defined and fundamental one is an issue of law and is to be made by the trial court." *Id.* (quoting *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834, 841 (Wis. 1983).

I cannot find a case where a Colorado court addressed the issue of whether FDA regulations can form the basis of a public policy discharge claim. "Colorado courts have held that claims may proceed when the discharge was in retaliation for the exercise of a specific statutory right or duty in two situations. *Vaske v. DuCharme, McMillen &*

*Assocs.*, 757 F.Supp. 1158, 1163 (D. Colo. 1990). The first situation is in claims where discharge was in retaliation of an employee exercising his or her rights under Colorado's worker's compensation law. *Id.* Plaintiff has not asserted that he was discharged in retaliation for exercising his rights under Colorado's worker's compensation law. And the second situation where suits have been permitted to proceed is when employees have been directed by their employers to violate certain statutes, subjecting them to criminal liability. *Id.*

Although Plaintiff's argument is not completely clear, it appears that Plaintiff is claiming that Defendant directed Plaintiff to violate 21 U.S.C. § 331 and 21 C.F.R. § 211.194. Plaintiff cites to 21 U.S.C. 331 *et seq* (2003) which prohibits introducing into interstate commerce, or delivering for such introduction an adulterated drug. 21 U.S.C. § 331(a). "Any person who violates a provision of [21 USCS § 331] shall be imprisoned for not more than one year or fined not more than $1,000, or both." 21 U.S.C. § 333(a)(1)(2003). Plaintiff also points to 21 C.F.R. § 211.194 (2003), for the proposition that laboratory records are required to be prepared and kept in highly specified ways. "While § 331(a) [describes] a crime [in] which scienter is not a necessary element, it does not follow that... every employee...would have potential criminal liability; rather, only those who share in the responsibility of distributing adulterated or misbranded drugs in interstate commerce are potentially criminally liable." *United States v. Abbot Laboratories,* 505 F.2d 565, (5th Cir. 1974), *cert. denied* 95 S.Ct. 1424 (1975). While the violation of the instant statute could result in criminal penalties for the employer, there is no such potential result for the Plaintiff. Thus, Plaintiff does not fall into either

category that the Colorado courts have held that claims may proceed when the discharge was in retaliation for the exercise of a specific statutory right or duty.

Here, even assuming that 21 U.S.C. § 331(a) and 21 C.F.R. § 211.194 create potential criminal liability for the Plaintiff and viewing the facts in a light most favorable to Plaintiff, I find that Plaintiff was not directed to perform an illegal act by Sandoz. It is undisputed that Plaintiff continued to document the information in the manner that he believed was appropriate and that Sandoz allowed him to do so. In fact, Plaintiff persuaded other employees to do the same.

As to the third element, Plaintiff claims that the working conditions at Sandoz became so intolerable that he was constructively discharged for refusing to perform an illegal act. "The question on which constructive discharge cases turn is simply whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Emerson v. Wembley USA Inc.*, 433 F.Supp.2d 1200, 1219. (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986)). "Essentially, a plaintiff must show that she had 'no other choice but to quit.' " *Id.* (quoting *Yearous v. Niobrara County Mem. Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997)). The conditions of employment must be objectively intolerable; the "plaintiff's subjective views of the situation are irrelevant." *Id.*

Here, I find there is no genuine issue of material fact as to whether Plaintiff was constructively discharged. Plaintiff asserts that following his complaints about Tutt's noncompliance issues, he was given a fraudulent review based on improper criteria, which denied him a promotion, denied him the raise he usually received, earned him a

dismissive attitude from Tutt, and cemented his status as a pariah. He also asserts that Tutt failed to share information with Plaintiff that was necessary to perform the job when he did not tell Plaintiff of a new computer program to keep track of sampling. It is important to note that unsupported conclusory allegations, however, do not create an issue of fact. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir.2004). And here, Plaintiff presents no evidence as to the facts and instead cites to his own deposition testimony. Taking the events described in the preceding discussions in the light most favorable to Plaintiff, I can discern no actions that alone or collectively would compel a reasonable person to believe he had no choice but to resign. Most telling, is the fact that Plaintiff did not resign from his position with Sandoz until nearly two years after his complaint. Plaintiff may have been unhappy at Sandoz, but "not every unhappy employee has an actionable claim of constructive discharge." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1282 (Co. App. 2005)(quoting Bolden v. PRC Inc., 43 F.3d 545, 552 (10th Cir.1994)).

### B. FMLA Claim

To state a prima facie case of retaliation, Plaintiff must show that: 1) he engaged in a protected activity; 2) Defendant took an action that a reasonable employee would have found materially adverse; and 3) there exists a causal connection between the protected activity and the adverse action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). (Internal citation omitted). To establish the third element of a prima facie case of retaliation, Plaintiff must show a causal connection between his protected activity of taking FMLA leave and the employer's decision to

terminate his employment.  *Id.*

Here, the parties agree as to the first element that the Plaintiff engaged in a protected activity.   As to the second element, whether an employment action is considered adverse is on a case by case basis.  *Stover v. Martinez*, 382 F.3d 1063, 1071 (10th Cir.).  Under a liberal construction of the phrase "adverse employment action," the action must amount to "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or ... causing a significant change in benefits.  *Id.* (quoting *Burlington Indus., Inc v. Ellerth*, 524 U.S. 742, 761, 141 L.Ed. 2d 633, 118 S. Ct. 2257 (1998)).

Plaintiff contends that, on October 5, 2005, only one day after his negative mid-year review and written verbal warning, Tutt assigned half of Robert Wood's workload to Plaintiff, though they both already had similar workloads.  A written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status.  *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215 (10th Cir. 2006).  "A mere inconvenience or alteration of job responsibilities" is not adverse employment action.  *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)(holding that teacher transfer was not adverse when her salary and benefits remained the same).  Absent evidence of materiality, reassignment of job duties is not automatically actionable.  *McGown v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006).

Viewing the facts in the light most favorable to Plaintiff, I  find that the conduct complained of by Plaintiff upon his return, including the warnings given to him regarding

his work performance and the reassignment of half of Robert Wood's workload to Plaintiff meets this test. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1214-15, 1220 (10th Cir. 2002) (assuming that negative performance evaluations, requests for computer and other work equipment similar to those provided other employees were adverse actions for purpose of retaliation claim).

I now turn to whether Plaintiff has established disputed material facts on the third element of a FMLA retaliation claim - whether a causal connection exists between the protected activity and the materially adverse action. I find that Plaintiff has demonstrated sufficient circumstantial evidence of causation by alleging that he received the negative job reviews and the work reassignment two months after his return from FMLA leave. "[T]he required link between the protected activity and subsequent adverse employment action can be inferred if the action occurs within a short period of time after the protected activity." *McGown*, 472 F.3d at 744.

Having found sufficient evidence of causation, I turn to the analysis required by the *McDonnell-Douglas* framework. Retaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-04. 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). (Internal citation omitted). The plaintiff bears the initial burden of establishing the prima facie case of retaliation. *Id.* If the plaintiff does so, the defendant must offer a legitimate, non-retaliatory reason for the employment action. *Id.* Then, the plaintiff bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual. *Id.*

Here, Defendant offers two non-retaliatory reasons for the employment action. First, Defendant contends that the work reassignment occurred because Plaintiff's co-worker was training another employee. And second, Defendant contends that the negative job reviews following Plaintiff return from FMLA leave, were unrelated to Plaintiff taking such leave and instead were related to Defendant's well documented concerns regarding Plaintiff's work ethic and non-FMLA absences. I find that Defendant has offered a legitimate non-retaliatory reason for the employment action.

Thus, "the burden then shifts back to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual.'" *Richmond v. Oneouk*, 120 F.3d 205, 208 (10th Cir. 1997)(quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995) (internal quotation marks omitted). "A plaintiff can demonstrate pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's ... reasons for its action,' which 'a reasonable factfinder could rationally find .. . unworthy of credence.'" *Id.* at 209 (quoting *Morgan*, 108 F.3d at 1323) (citations and internal quotations omitted). "Mere conjecture that the employer's reason is pretext, however, will not defeat a motion for summary judgment." *Id.* "Evidence of discrepancies between an employer's prior treatment of a plaintiff and its treatment of [him] following [his] return from leave may be used to demonstrate pretext." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1291 (10th Cir. 2007). An employer's failures to follow written or unwritten policy may support a showing of pretext, particularly if other similarly-situated employees were treated differently. *Id.*

In the case at hand, I find that Plaintiff has demonstrated some evidence of pretext and that summary judgment should be denied. Plaintiff received both the "verbal" warning and the "Off-cycle Performance Feedback" letter shortly after his return from FMLA leave. Although Defendant argues that Plaintiff had a history of non-FMLA absences in violation of Sandoz's attendance policy and that there were documented concerns about Plaintiff's work ethic, the first time Plaintiff learned that he was being criticized for these absences was after Plaintiff returned from FMLA leave. I find that this discrepancy could be evidence of pretext. Therefore, summary judgment is denied as to this claim.

### C.   Outrageous Conduct Claim

"The Workers' Compensation Act provides exclusive remedies for employees suffering work-related injuries and occupational diseases." *Horodyskyj v. Karanian*, 32 P.3d 470, 474. "Colorado's workers' compensation system establishes the benefits available to workers injured in the course and scope of employment and the procedures for obtaining those benefits." *Id.* Colorado Workers' Compensation Act provides the exclusive remedy for work related emotional distress. *Smith v. Colorado Interstate Gas Co.*, 794 F. Supp. 1035, 1042 (D. Colo. 1992). See also *Farmer v. Central Bancorporation, Inc.*, 761 P.2d 220 (Colo. App. 1988)(affirming trial court's dismissal of outrageous conduct claim as being preempted by the Workmen's Compensation Act).

Defendant asserts that Plaintiff's outrageous conduct claim is barred by Colorado's Worker's Compensation Act ("CWCA"), C.R.S. § 8-40-101 *et seq.* Plaintiff contends that because his claimed mental and emotional damages are from Sandoz's

conduct and because there is a claim for physical damages the Workers' Compensation Act does not apply. Under the Act, an employee is entitled to recovery "[w]here, at the time of the injury, the employee is performing service arising out of and in the course of the employee's employment. C.R.S. § 8-40-101. "An injury occurs 'in the course of' employment when it takes place within the time and place limits of the employment relationship and during an activity connected with employee's job-related functions." *Horodysky*, 32 P.3d at 475. "The term 'arises out of' refers to the origin or cause of an injury." *Id.* "There must be a causal connection between the injury and the work conditions for the injury to arise out of the employment." *Id.* Here, Plaintiff's claim is premised on work-related retaliation, work-related performance reviews, and work-related hostile environment. There is no evidence in the record to suggest that any alleged retaliation he experienced was the consequence of any personal relationship or personal dispute. *See Public Serv. of Colo. V. ICAO*, 68 P.3d 583, 586 (Colo. App. 2003)(holding that the Act covered retaliation against an employee following his testimony in a co-worker's lawsuit). I find that Plaintiff has failed to allege sufficient facts to allege a claim of Intentional Infliction of Emotional Distress as a matter of law.

Even assuming *arguendo*, that Plaintiff's claim is not barred by the Worker's Compensation Act, Plaintiff has failed to allege sufficient facts to maintain a claim of Intentional Infliction of Emotional Distress. "The elements of outrageous conduct are: 1) the defendant engaged in extreme and outrageous conduct; 2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and 3) the defendant's conduct caused plaintiff to suffer severe

emotional distress." *McCarty v. Kaiser-Hill Co., L.L.C.*, 15 P.3d 1122, 1126 (Colo. App. 2000), *cert. denied* (Jan. 2001) [cited in *Archer v. Farmer Bros. Co.*, 2002 WL 926395 (Colo. App. 2002)]. "Although the question whether conduct is outrageous is generally one of fact to be determined by a jury, it is the initial responsibility of a court to determine whether reasonable persons could differ on the question." *McCarty*, 15 P.3d at 1126. "The level of outrageousness required for conduct to create liability for intentional infliction of emotional distress is extremely high." *Id.*; *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665 (Colo. 1999) (en banc) (a plaintiff must allege behavior by a defendant that is extremely egregious" in order to state an outrageous conduct claim); " *Visor v. Sprint/United Mgmt. Co.*, 965 F. Supp. 31, 33 (D. Colo. 1997) ("The tort contemplates an extreme level of independently ascertainable misconduct . . . .").

"Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and callously inflicted." *Gard v. Teletronics Pacing Systems, Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994). Examples of cases where a claim of outrageous conduct was not permitted as a matter of law include *Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999) (en banc). There, the Tenth Circuit accepted as true (for purposes of a motion to dismiss) "that Coors engaged in an extensive criminal conspiracy involving illegal drugs and money laundering and that Coors fired Floyd to scapegoat him for these crimes." *Id.* at 666. The Colorado Supreme Court held that this conduct as a matter of law was

not outrageous. Moreover, *Floyd* discussed another case, *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619, 621 (Colo. App. 1988) where several plaintiffs alleged claims for outrageous conduct and wrongful discharge in violation of public policy, stating that they were fired for being asked to engage in illegal practices or to give untruthful testimony during the investigation of these activities. *See Floyd*, 978 P.2d at 666. Although the wrongful discharge claims in that case were sufficient to survive summary judgment, the outrageous conduct claim "did not meet the high standard for outrageous conduct claims . . . ." *Id.*

I find that summary judgment is proper on this claim. Specifically, I find that Plaintiff's allegations are not so egregious as to give rise to an outrageous conduct claim. Plaintiff directs the court to the same body of evidence used in support of his allegation of constructive discharge. For the same reasons discussed in connection with those actions, I also find no conduct complained of by Plaintiff that rises to the level of outrageous conduct, and grant summary judgment as to this claim.

### D.   Overtime Pay Claim

Both parties move for summary judgment as to Plaintiff's Fair Labor Standards Act ("FLSA") claim. Defendant asserts that Plaintiff was properly classified as an exempt employee under the FLSA. Generally, the Fair Labor Standards Act requires that employers pay their employees overtime for all hours worked in excess of forty (40) hours per week. There is an exemption to this general rule, however, for any employee employed in a "professional" capacity. 29 U.S.C. § 213(a)(1). Exemptions to the FLSA are to be narrowly construed. *Reich v. Wyoming*, 992 F.2d 739, 741 (10th Cir. 1993).

The employer must show the employees fit plainly and unmistakably within the exemption's terms." *Id.* (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 4 L. Ed. 2d 393, 80 S. Ct. 453 (1960). The question of how Plaintiff spent his time while working at Sandoz is a question of fact. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d (1986). The question of whether his particular activities excluded him from the overtime benefits of the FLSA is a question of law. *Id.* Because Plaintiff's claim encompasses pay periods both before and after the August 2004 amendments to the FLSA regulations, both the pre-2004 regulations and the current regulations must be applied. See *Archuleta v. Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1180 n.2 (10th Cir. 2005)(applying regulations in effect during the time period in which the plaintiffs' complaints arose).

The pre-2004 regulations establish two tests for determining whether an individual is exempt from the FLSA as a bona fide "professional" employee. An employee who is paid a salary of at least $250 per week triggers the application of the short test. 29 C.F.R. § 541.3(a)(1),(e) (2003). Under that test, "[An] employee employed in a bona fide professional capacity... shall mean any employee... (a) whose primary duty consists of the performance of: (1) [w]ork requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study as distinguished from a general academic education and from an apprenticeship, and (2) [w]hose work require[s] the consistent exercise of discretion and judgment... shall be deemed to meet all of the requirements of this section." 29 C.F.R. § 541.3(a)(1), (e) (2003). The long test applies

to employees making not less than $170 a week and contains additional requirements for an employee to achieve exempt status. *Id*.

Defendant asserts that Plaintiff's position as a microbiologist requires a college degree in the sciences. Plaintiff disputes that his primary duties consist of the performance of work requiring knowledge of advanced type in the field of science, and instead claims that persons with a high school degree and/or on the job training would be able to perform his primary job duties. I find that there is material issue of fact as to whether the Plaintiff's primary duty at Sandoz consists of the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study as distinguished from a general academic education and from an apprenticeship. Because I find that there are genuine issues of fact, both parties' summary judgment motions are denied as to this claim.

**E.      Plaintiff April Abrahamson's Claim for Loss of Consortium**

Defendant asserts that Plaintiff April Abrahamson's claim for loss of consortium is derivative of her husband's tort claim for wrongful discharge in violation of public policy and outrageous conduct, and as such, her claim fails if her husband's underlying tort claims fail. "A loss of consortium claim is derivative of the underlying claim and therefore subject to the same defenses." *Schwidt v. Hershey Foods Corp.*, 81 P.3d 1144, 1148 (Colo. App. 2003). "Nevertheless, derivative claims are separate from the claims of an injured person. Therefore, as a separate claim, loss of consortium is a direct cause of action." *Terry v. Sullivan*, 58 P.3d 1098, 1102 (Colo. App. 2002).

Because Plaintiff April Abrahamson's loss of consortium claim is separate from the claims of Plaintiff Steve Abrahamson, I find summary judgment is not appropriate as to the loss of consortium claim.

## IV.    CONCLUSION

Based on the foregoing reasoning, It is hereby

ORDERED that Plaintiff's Motion for Partial Summary Judgment, filed April 30, 2007 (docket # 80) is **DENIED**.  It is

FURTHER ORDERED that Defendant's Motion for Summary Judgment, filed July 12, 2007 (docket # 87) is **DENIED IN PART AND GRANTED IN PART**.  It is

FURTHER ORDERED that Defendant's Motion for Summary Judgment is **GRANTED** as to:

1)    Wrongful Discharge in Violation of Public Policy Claim

2)    Intentional Infliction of Emotional Distress Claim

It is FURTHER ORDERED that Defendant's Motion for Summary Judgment is **DENIED** as to:

1)    Family Medical Leave Act Retaliation Claim

2)    Fair Labor Standards Act Claim

3)    April Abrahamson's Loss of Consortium Claim

Dated:  March 31, 2008

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge